## UNITED STATED DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN CHRISTOPHER LAUTO,<br><br>                              Plaintiff,<br><br>        v.<br><br>DOVER PUBLIC SCHOOL DISTRICT, DOVER BOARD OF EDUCATION, and DOVER HIGH SCHOOL,<br><br>                              Defendants. | Civil Action No.:<br><br>*(Filed Electronically)*<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Steven C. Lauto ("Plaintiff" or "Mr. Lauto"), by and through his attorneys, Dawkins & Warrington Law Group LLC, as and for his Complaint in this action against Defendants Dover Public School District, Dover Board of Education, and Dover High School (collectively, "Defendants"), hereby alleges as follows:

### NATURE OF THE CLAIM

1.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including its discriminatory treatment and harassment of Plaintiff due to his disability and its unlawful retaliation against him after he complained about unlawful discrimination in the workplace.

2.      This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), et seq., as amended by the Civil Rights Act of 1991, at 42 U.S.C. §1981(a) ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. ("ADA"), and the New

Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD").

## SUBJECT MATTER JURISDICTION AND VENUE

3.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as

this action arises under the Constitution and laws of the United States, and pursuant to 28

U.S.C. § 1342(a)(4) because this action seeks to redress the deprivation, under color of state

law, of Plaintiff's constitutional rights. The Court has supplemental jurisdiction over

Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2)

because a substantial part of the events or omissions giving rise to this action, including the

unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

5.      Prior to the filing of the present Complaint, Plaintiff filed a charge of

discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging

violations of Title VII.

6.      Plaintiff's EEOC charge arises out of many of the same facts alleged herein

that pertain to his Title VII discrimination claim.

7.      On or about August 3, 2021, the EEOC completed its investigation of

Plaintiff's charge and issued Plaintiff a Notice of Right to Sue.

8.      Any and all prerequisites to the filing of this suit have been met.

## PARTIES AND PERSONAL JURISDICTION

9.      Plaintiff, Steven C. Lauto ("Plaintiff" or "Mr. Lauto"), a resident Rockaway,

New Jersey 07866, is an over 40-year-old male and high school teacher with over two (2)

decades of experience in the classroom.  Mr. Lauto has worked for Defendants for about the same amount of time.  On September 1, 2000, Mr. Lauto began his employment for the Dover Public Schools (hereinafter, "DPS") as a Business Education Teacher assigned to Dover High School (hereinafter, "DHS").  He has held this full-time position with the Dover Public Schools since that date.  Mr. Lauto is a tenured teacher and is a member of the Dover Education Association, which is a part of the New Jersey Teachers Union – NJEA.

10.    Defendant DPS is a public school district that serves students in pre-kindergarten through twelfth grade and maintains a physical address at 21 Belmont Avenue, Dover, NJ 07801.

11.    DPS employs over 215 teachers in addition to over 200 other employees who support its mission "to provide an optimum educational experience for all students, creating a passion for learning and encouraging all students to perform to their highest academic potential while promoting self-expression, cooperation, and respect for others."

12.    Defendant DHS is a public high school that serves students in ninth to twelfth grade and maintains a physical address at 100 Grace St., Dover, NJ 07801.

13.    Defendant Dover Board of Education (hereinafter, "BOE") is a publicly elected board of representative officials charged with the responsibility to represent the concerns of the citizens, taxpayers and parents to the school administrators, and to represent the needs of Dover's students and DPS to the citizens, taxpayers and parents of the Dover, New Jersey community.

14.    Defendant BOE also is responsible for setting district policy and overseeing the proper dissemination of the DPS's annual budget.  The BOE maintains a physical address at 21 Belmont Avenue, Dover, NJ 0780.

15.     Defendant BOE is comprised of nine (9) members whose role is to set policies for the DSD, approve budgets and undertake responsibilities set forth in N.J.S.A. 18A:11-1.

16.     Dahiana Grisales is the President of Dover's BOE and was present and presiding over the actions of the BOE at all times here relevant.

17.     Karol Ruiz is the Vice President of Dover's BOE and was present and participated in several of the indictments involving the BOE at all times here relevant.

18.     Dr. James V. McLaughlin is the Superintendent of DPS and was present and presiding over the actions of the DPS at all times here relevant. Dr. McLaughlin supervises all employees of the Dover Public School District with the assistance of his Assistant Superintendent, the principals of the various schools and the heads of various departments.

19.     Dr. Mclaughlin is hired by and reports to the BOE.

20.     Christina Cirigliano is the Vice Superintendent of DPS and at times here relevant required Plaintiff to report directly to her regarding his job performance.

21.     Robert Franks is the Principal at DHS and was present and presiding over the actions of DHS personnel at all times here relevant, and required Plaintiff to directly report to him regarding his job performance.

22.     Mr. Franks is assisted in his responsibilities by various teachers who also act as Supervisors of different departments including the Supervisor of Mr. Lauto's department.

23.     At all times relevant hereto, Defendants were acting through their agents, servants, and employees (i.e., McLaughlin, Cirigliano, Franks, Grisales, and Ruiz), who were acting within the scope of their authority, course of their employment, and under the direct control of Defendants.

**24.**     At all times material herein, Defendants are and have been a "person" and

"employer" as defined under the ADA, Title VII, and NJLAD, and is accordingly subject to the provisions of each said act.

## FACTS

25.     Plaintiff has served as a teacher for over two decades (23 years), twenty-two (22) of which years he has been with DSD and at DHS.

26.     Plaintiff teaches a variety of courses (e.g., courses on law, personal finance, and accounting), has coached sports teams (i.e., basketball), and, up until the 2020 academic year, for nineteen (19) years had provided supplemental accounting services to DSD.

*Background Concerning Plaintiff's Reports of Inappropriate Conduct by DHS Professionals*

27.     In or about April of 2016, Plaintiff was approached by one of his students and asked if Plaintiff was aware of another student that was engaging in sexual activities with then DHS guidance counselor, Ms. Deanna Palmieri (hereinafter, "Palmieri").

28.     Understanding his mandatory reporting duty for such a salacious and otherwise precarious claim brought to him by his student, Plaintiff immediately went to see his NJEA union representative and union Vice President, Kathleen Paterek (hereinafter, "UVP"), to discuss what his student reported to him.

29.     On the same day of Plaintiff's report to UVP, she placed a call with NJEA UniServ Field Representative, John Williams, regarding the "rumors". Mr. Williams explained to UVP that since the reporting happened just before the start of spring break of 2016, that he would get back to UVP over the course of the break.

30.     Indeed, Mr. Williams did follow up with UVP during spring break 2016, and immediately following spring break set up a meeting with himself, Plaintiff, and UVP, as well as a private NJEA attorney, at Mr. William's office in Parsippany, NJ.

31.     During the meeting the NJEA attorney informed UVP and Plaintiff that failure to report what Plaintiff's student had brought to his attention could expose him to accomplice liability.

32.     One day following Plaintiff's and UVP's meeting with Mr. Williams and the NJEA attorney, Plaintiff and UVP met with Principal, Robert Franks (hereinafter, "Principal"), and then Vice Principal, Michael McAuley (hereinafter, "VP"), to report the information they had learned from Plaintiff's student.

33.     On the same day, a second student approached Plaintiff about Ms. Palmieri, asking whether Plaintiff was the person he heard reported Palmieri to the administration.

34.     While Plaintiff did not confirm he was, the second student confided in Plaintiff, listing at least seven (7) other students he had personally seen engage with Palmieri sexually.  At a later date, this second student confided in Plaintiff that he was among a group of students that were sexually involved with Palmieri.

35.     Later in the same week, Plaintiff met with then Superintendent, Robert Becker, concerning the information shared by his students.  Plaintiff was removed from his fifth (5th) period class and was brought to the conference room to meet with three Dover Police Officers to report what his students had told him.

36.     In or about July of 2016, Plaintiff was approached by a third student and told that the student was among the group that had engaged sexually with Palmieri.  This third student also complained to Plaintiff that nothing had resulted from Plaintiff's attempts to report Palmieri.

37.     To Plaintiff's knowledge, this was the extent of DSD's follow-up on his reporting of sexual impropriety involving Palmieri and DHS male students.

*Defendants' Harassment of Plaintiff Begins*

38.     In or about October 2018, Principal began what appears to have been an independent investigation of Plaintiff.

39.     Plaintiff learned from one of his students that several of Plaintiff's students had been called down to the office to speak with Principal, and that Principal was asking Plaintiff's students questions about what things are said and done in Plaintiff's class.

40.     Plaintiff's student reported to him that Principal had requested that students keep confidential the fact that Principal had talked to the students about Plaintiff.

41.     Following this interaction with his student, Plaintiff reported the incident to UVP, and UVP committed to following up with Principal.

42.     UVP ultimately confirmed that Principal had been arbitrarily "interviewing" students in several of Plaintiff's classes.

43.     Indeed, when pressed by UVP Principal was vague in describing why he was "interviewing" students in all of Plaintiff's classes.

44.     UVP made Principal aware that Plaintiff knew precisely what is going on. Even so, Principal's improper investigation continued on for another week.

*DSD's Escalation of Harassment, Intimidation, and Retaliation*

45.     Following his reporting of Palmieri in 2016 to present day, Plaintiff was consistently the subject of the Defendants' ire.

46.     Specifically, Plaintiff was subject to various accusations from Principal and DSD administrators about inappropriate conduct that targeted him for his concededly sarcastic personality, including random investigations, questioning of his students, and ad hoc work requirements designed to target and punish Plaintiff.

47.     Further demonstrating a particularized targeting of Plaintiff, temporal comparators were afforded significantly more due process rights than ever afforded to Plaintiff at any time.

48.     For example, in or about December of 2017, Plaintiff became aware of a student complaint about DHS gym teacher, Ms. Jillian Zipfel (hereinafter, "Zipfel").

49.     Upon information and belief, the student's allegations against Zipfel were of a physical nature, involving "erotic stretching" with male students during physical education instruction.

50.     Unlike the treatment Plaintiff received for a similarly unfounded accusation, Zipfel was offered the opportunity to speak with her student accuser, to write and submit her part of the story, and Zipfel was never placed on administrative leave pending the results of an investigation of the reporting student's claim.

51.     The amalgamation of incidents transpiring at DHS between the 2016 to 2017 lead Plaintiff to seek professional treatment from a licensed therapist, which therapist diagnosed Plaintiff with Post-Traumatic Stress Syndrome ("PTSD").

52.     Since 2017, Plaintiff has consistently received psychological therapy from his treating therapist on a weekly basis.

53.     According to Plaintiff's treating therapist, circumstances transpiring between 2016-2018, including Plaintiff's reporting of Palmieri and two (2) workplace injuries sustained by Plaintiff in the course of breaking up student fisticuffs, culminated in Plaintiff being diagnosed with PTSD and being noted as temporarily "Unstable".

54.     On February 7, 2020, Defendants' consistent harassment began to intensify when Plaintiff received a letter from DSD's Director of Human Resources, Kevin Bullock,

placing Plaintiff on immediate paid leave "[a]s as result of the allegations and pending investigation" (the, "Suspension Letter").

55.     The Suspension letter stated, in relevant part, that "[o]n Thursday, February 6, 2020 the district received an allegation against you that required us to notify the Institutional Abuse Investigative Unit (IAIU)."

56.     DSD took this action to immediately report the unfounded allegations against Plaintiff without any advance notice of the claims against Plaintiff, without the ability for Plaintiff to address his accuser, without Plaintiff being able to present his side of the story, and without any opportunity to speak with DSD administrators and/or the DSD's Superintendent.

57.     Unlike the procedural due process rights afforded to his peers (e.g., the processes afforded to Zipfel and Palmieri), DSD's Suspension Letter immediately placed Plaintiff "on paid leave" and further provided that Plaintiff would be "notified at the appropriate time when the investigative activities by IAIU and/or the District are complete and the findings have been determined."

58.     In comparison to those procedural rights afforded to his comparators, Plaintiff's process was improper and abrupt.

59.     To the point, Plaintiff was called on his phone by Principal at 4:17pm on February 6, 2020 and was told he was under investigation and would not be allowed back in the DHS building the next day, so he should not report.

60.     On or about March 5, 2020, following the IAIU's investigation and favorable finding for Plaintiff, DSD conducted and concluded an ad hoc investigation of its own.

61.     Defendants never informed Plaintiff that he was subject to a secondary

investigation, nor ever provided Plaintiff with the results of said investigation until Plaintiff filed his EEOC charge, notwithstanding Plaintiff's multiple requests for same to Superintendent McLaughlin, Principal Franks, and Ms. Cirigliano.

62.    The results of DSD's sham ad hoc investigation suggest that Plaintiff made use of occasional profanity in the classroom out of frustration and never directed at students, and further makes clear that Plaintiff did not discuss any inappropriate or sexual topics with his students.

63.    An objective reading of the results of DSD's ad hoc investigation further evidences the pretextual nature of Defendants' position.

64.    That is, when Defendants could not find proof that Plaintiff had engaged in inappropriate sexual discussions and/or conduct with his students, DSD needed some issue to latch onto to justify its unlawful and discriminatory treatment of Plaintiff.

65.    Critically, upon information and belief, Plaintiff's circumstance is the very first time DSD has ever attempted to subject a teacher to discipline for unintentional use of profanity in the classroom.

*DSD & IAIU Investigate Sexual Abuse Allegations Against Plaintiff*

66.    On February 25, 2020, Plaintiff received a letter from IAIU Investigator, D. Edwards, and IAIU Supervisor, N. Labonne (the "IAIU Letter").

67.    The IAIU Letter completely absolved Plaintiff of any wrongdoing, stating, in relevant part, that "Sexual Abuse/ Risk of Sexual Abuse is **Unfounded**. IAIU has determined that the children were not abused or neglected in accordance with N.J.S.A. 9:6-8.21, and information indicates that the children were neither harmed nor placed at risk of harm." (Emphasis in original).

68.     On February 28, 2020, Plaintiff's NJEA attorney, Joshua M. Foresman, Esq.,

sent correspondence to Plaintiff's, UniServ Field Representative, John C. Williams, and

Superintendent, Dr. McLaughlin, putting them on notice of the "Unfounded" determination

from the IAIU and the rights afforded to Plaintiff as a result of the positive investigation

outcome.

69.     NJEA attorney Foresman's letters specifically outline the following rights

afforded to Complainant based on the results of the IAIU investigation's outcome:

> Under N.J.S.A. 18A:6-7a, a complaint made against a school
> board employee that has been classified as unfounded by the
> IAIU cannot be use against said employee by the school board
> employer, such as by imposing disciplinary action against him,
> strictly on the basis of the Findings Report. . . [N.J.S.A. 18A:6-
> 7a] also prohibits your school district from maintaining records
> referring to the IAIU's investigation in your employee
> personnel file. . . [and] [A]ll records pertaining to the IAIU
> investigation must be kept confidential.

70.     Further, attorney Foresman demanded Plaintiff's "immediate reinstatement in

light of the favorable Findings Report."

71.     Defendants have violated each of these three legally imposed proscriptions

outlined by attorney Foresman, and further failed to reinstate Plaintiff for another several

months.

72.     In attorney Foresman's letter directly to Superintendent Dr. McLaughlin, he

makes three critical points regarding Complainant's legal rights flowing from the IAIU's

"Unfounded" determination.

73.     First, attorney Foresman explains that the Finding Report afforded Plaintiff "a

number of legal protections".  Specifically, attorney Foresman explained that "the Dover

Board of Education ('Board') **may not take disciplinary action against Mr. Lauto**,

including reduction of salary, transfer, demotion, or loss of any employment privilege, **based on the complaint made to IAIU.**"  (Emphasis added).

74.     Attorney Foreman further notes, "[*N.J.S.A.* 18A:6-7a] also prohibits the Board from placing any documents referring [to] the IAIU investigation in Mr. Lauto's personal file."

75.     Last, attorney Foresman's letter makes clear that DSD was already failing to meet its obligation under the law where "despite the IAIU's extremely favorable determination, Mr. Lauto has not yet been cleared to resume regular work duties at the High School."

76.     Thus, attorney Foresman advises that DSD "please discuss this matter with your attorney, if you are represented by one, and ensure Mr. Lauto is reinstated to his usual teaching position as soon as possible."

77.     On March 12, 2020, Plaintiff received a letter from Superintendent Dr. McLaughlin, stating that the BOE "may discuss your employment status on Tuesday, March 17, 2020 in the Board Conference Room at Dover High School."  The letter further stated Plaintiff was to be discussed in "closed session from which the public is excluded."

78.     Also on March 12, 2020, Plaintiff met with his NJEA attorney, Crystal Alonso, and a BOE attorney in the conference room at DHS.

79.     At the meeting, Plaintiff was informed that he was being interviewed by the BOE attorney on behalf of DSD.

80.     Plaintiff was never informed of the start nor the results of DSD's ad hoc investigation by its BOE and was never directly interviewed by Principal or anyone specifically from DHS regarding any additional claims against him.

81.     Defendant BOE's attorney asked Plaintiff the same questions the IAIU investigator asked Plaintiff during their investigation and specifically rehashed the incident that led to the IAIU investigation.

82.     DSD's ad hoc investigation directly violated Plaintiff's rights pursuant to N.J.S.A. 18A:6-7a (and other laws), as explained in attorney Foresman's February 28, 2020 letter to Superintendent Dr. McLaughlin.

83.     On May 18, 2020, approximately three (3) months following DSD's receipt of attorney Foresman's letters, DSD's personnel, Ms. Lori Loiacono, presented Plaintiff with, and Plaintiff executed, his 2020-2021 School Year Employment Contract.

*DSD Harasses, Retaliates, Defames, and Conspires Against Plaintiff*

84.     In or about May 2020, Plaintiff became aware of a concerted effort to undermine his reinstatement, involving members of the BOE, Principal Franks, and students and/or alumni.

85.     In the course of teacher contract negotiations, there were several instances of public comments at BOE public meetings that support Plaintiff's contention that it was common knowledge among certain groups that DSD was targeting certain teachers and attempting to "push them out" of the District.

86.     For example, during the May 5, 2020 BOE meeting, Dover resident Susan Shauer stated, "I see on tonight's agenda another employee put on administrative leave.  To my/ public knowledge this is the third employee put on leave in 9 months."

87.     Upon information and belief, the employee referred to in Ms. Shauer's comments is Plaintiff.

88.     On June 16, 2020, Plaintiff virtually attended a BOE meeting where past BOE

President, Dr. Monica Palestis' husband, Dr. Ernest Palestis (hereinafter, "Dr. Palestis"), spoke.

89.     Dr. Palestis corroborated that the BOE was actively conspiring against teachers at DHS based on his review of correspondences received in response to an Open Public Records Act (OPRA) request.

90.     To the point, Dr. Palestis stated the following during the public comment section the meeting:

> In January of this year, I obtained every email sent and received by each Board Member; via an OPRA request.  The time period included January 2019 through January 2020. . . . The evidence is startling and scary, because I have email evidence that the vice president, president, and their political boss have discussed teachers, administrators, and other confidential issues via secret email. . . . The thousands of emails that I read indicate that the vice president and president and the political boss of the [DBOE] have stabbed Dover staff in the back.  There is a pattern of behavior here.
>
> . . .
>
> This horrible behavior by the vice president, president, and their political boss is NOT ok with me.  I served as a superintendent of schools for 27 years.  I can assure you that I have NEVER observed anything like this.  There are six other Dover Board of Education members.  When will you speak up? . . . Honestly, I don't think that you will do a single thing to discipline our three out of control Board members.  **This is why I say: Dr. Seanor, Ms. Grisales, and Ms. Ruiz MUST resign tonight.**  Our residents deserve an ethical Board of Education.  Our staff deserve an ethical Board of Education. Our students deserve an ethical Board of Education.
>
> [(Emphasis added).]

91.     Also in June of 2020, supporting Plaintiff's contention that he was the subject of the BOE's efforts and Dr. Palestis' contention that a conspiracy was in operation at that time, Plaintiff was contacted by a DHS alumnus who shared with Plaintiff screenshots of a

secure, social media chatroom application called Signal.

92.     According to Signal's website, "Signal is committed to the mission of developing open source privacy technology that protects free expression and enables secure global communication." (*See* https://signal.org/donate/ - last visited 8/28/2021).

93.     Upon information and belief, BOE member, Karol Ruiz, created and presided over the Signal chatroom in question at all times here relevant.

94.     Plaintiff's student allowed Plaintiff to take pictures of his phone, which depicted BOE member Ms. Ruiz actively engaging with a number of minor students and DHS alums in a discussion in which Ms. Ruiz solicited information about DHS teachers' inappropriate interactions with students, specifically seeking information regarding Plaintiff.

95.     Ms. Ruiz is also seen in the Signal chatroom making plans to target teachers at DHS, encouraging the individuals in the Signal chat to engaging in a letter-writing campaign to the BOE, instructing the members of the Signal chat to come to the BOE meetings and use the public comment portion of the BOE meeting to "expos[e] each and every one of the allegations you have made on this thread", and Ms. Ruiz further provides information to the Signal group members on where to send information to harm DHS teachers, stating, "Please consider putting all of this in writing and sending it in an email to the superintendent and ALL board members: https://dover-nj.org/m/pages/index.jsp?uREC_ID=415586&type=d&pREC_ID=759514".

96.     Importantly, in dereliction of her fiduciary and reporting duties, Ms. Ruiz comforts concerned Signal group members by stating, "No one will be pushed to speak. All we say stays private. As private as it can be."

97.     Plaintiff's student explained that there was a particular emphasis on targeting

Plaintiff as a person that had engaged in sexual misconduct with his students, and further described that such discussions were specifically prompted by BOE member Ruiz.

98.     In the Signal chat, several DHS students and alum share stories and allegations accusing Plaintiff of maintaining inappropriate relationships with students.

99.     Several of Ms. Ruiz's statements were directed specifically at Plaintiff in the Signal chat.

100.    On June 17, 2020, Plaintiff received a letter from Superintendent McLaughlin stating, in relevant part, "The [BOE] may discuss your employment status on Tuesday, July 21, 2020 during a virtual executive meeting."  The letter further states Plaintiff was to be discussed in "closed session from which the public is excluded."

101.    On June 24, 2020, Plaintiff received another letter from Superintendent McLaughlin stating, in relevant part, "Please be advised that on June 16, 2020 the [BOE] accepted my recommendation and passed a resolution withholding your employment adjustment increments, effective July 1, 2020."  Dr. McLaughlin letter further states, "[t]he reason for this action is your use of inappropriate language and discussion of inappropriate topics in the presence of students, including the repeated use of profanity."

102.    Superintendent McLaughlin's June 24, 2020 letter directly violates Plaintiff's rights pursuant to N.J.S.A. 18A:6-7a, as explained in attorney Foresman's February 28, 2020 letter to Superintendent McLaughlin.  Moreover, it appears Superintendent McLaughlin and the BOE, lacking sufficient reason to target Plaintiff following the IAIU Investigation's favorable finding, attempted to punish Plaintiff a second time for incidents transpiring well in the past that had already been addressed in Plaintiff's employee personnel file.

103.    On June 30, 2020, four (4) months after the IAIU's favorable finding for

Plaintiff, Plaintiff received a letter from Principal Franks stating, in relevant part, "This

letter serves as notice of your tentative assignment for the 2020 – 2021 school year."

104.    The letter noted Plaintiff would have the following assignments: (1) Teacher –

Business, and (2) Personal Finance, Law for Business and Personal Use.

105.    Upon information and belief, DSD improperly denied Plaintiff the accounting

job he held for nineteen (19) consecutive years, giving the job instead to one of Plaintiff's

colleagues that was not qualified for the job for the 2020-2021 school year, in direct

violation of Plaintiff's rights pursuant to N.J.S.A. 18A:6-7a, as explained in attorney

Foresman's February 28, 2020 letter to Superintendent McLaughlin.

_DSD Harasses, Intimidates, Discriminates, and Retaliates Against Plaintiff_

106.    On August 10, 2020, notwithstanding IAIU's favorable finding for Plaintiff

months prior, Plaintiff received a letter from Superintendent McLaughlin stating, "I am prepared

to recommend your return to the classroom this fall **on two conditions**.  The first is that you

**submit to a mental health examination to determine your fitness for duty**.  The second is

that you **comply with a Corrective Action Plan** to be developed by your direct supervisor and

the school administration."  (Emphasis added).

107.    Superintendent McLaughlin's letter further provides, "With regard to the fitness

for duty examination, the Board of Education is requiring you to undergo a mental health

examination to determine your fitness to perform your job and to detect any risks to the health of

students or other employees."

108.    Significantly, by their own admission, Superintendent McLaughlin stated outright

that "**[t]he reason for the examination is that you have shown evidence of a deviation from**

**normal mental health.**" (Emphasis added).

109.   Superintendent McLaughlin's letter clearly shows that Plaintiff was perceived as having a mental health condition and that Defendants were making their determinations about his employment based on his perceived disability.

110.   Accordingly, by Superintendent McLaughlin's own admission, Plaintiff was being overtly discriminated against based on the perception that he had a mental disability.

111.   The preconditions imposed by DSD were in direct violation of Plaintiff's rights pursuant to N.J.S.A. 18A:6-7a (and other laws), as explained in attorney Foresman's February 28, 2020 letter to Superintendent McLaughlin.

112.   On August 14, 2020, Plaintiff's NJEA attorney, Crystal A. Alonso, sent correspondence to BOE attorney, stating, in relevant part, "[I]t is Mr. Lauto's intention to invoke his right to have a fitness for duty examination conducted by a physician of his own choosing, at his expense, pursuant to N.J.S.A. 18A:16-3."

113.   On September 8, 2020, attorney Alonso sent additional correspondence to DSD and the BOE stating, in relevant part, "Given that, Mr. Lauto has scheduled an appointment with Dr. Jennifer Butler-Sweeney on Wednesday, September 16, 2020, please provide confirmation that the Board authorizes Dr. Butler-Sweeney to perform my client's examination."

114.   On September 29, 2020, Plaintiff received a letter from examining doctor, Dr. Jennifer Butler-Sweeney, which notes that she reviewed Plaintiff's past fitness for duty examination and collaborated with Plaintiff's ongoing treating therapist, Dr. Siobhan Berger.

115.   Of note, the letter states, "My overall impression of Mr. Lauto is that he is an

articulate, vivacious, and intelligent man with an obvious dedication to his daughter and to the well being [sic] of his students." She goes on to conclude, "Consistent with the previous psychological evaluation conducted seven years ago, I did not see any presence of psychotic symptoms, disordered thinking or evidence of depression, generalized anxiety or panic disorder, nor any other diagnostic presentation."

116.    Moreover, Dr. Butler-Sweeney concludes, "[G]iven my review of the records in conjunction with my consultation with Mr. Lauto and then subsequently, his psychologist, I feel confident in offering my clinical opinion that Mr. Lauto poses no threat to himself, his peers, or the students he teaches", and that "I believe he will take what he has learned and apply it to his interactions with the current and future students and therefore, I submit that Mr. Lauto is fit to resume his duties as a teacher and be a positive asset to his educational community."

117.    Even after having submitted to DSD's unlawful preconditions for reinstatement of Complainant's teaching duties, DSD has continued to target Plaintiff with unfair and unlawful discriminatory treatment.

118.    Altogether, Plaintiff was suspended based on a single unfounded allegation of inappropriate use of language in class for eight (8) months or approximately 243 days, from February 6, 2020 to October 6, 2020.

119.    In our State, under similar circumstances (e.g., use of racial slurs in the midst of students), teachers have received far lesser time than the approximate 243-day suspension Plaintiff was subjected to by the DSD, and for indisputably worse behavior.

*Plaintiff's Treating Therapist Provides DSD with an Independent Expert Report*

120.    On December 3, 2020, Plaintiff caused his therapist, Dr. Siobhan Berger, to

draft an expert report concerning his mental and emotional fitness for duty (hereinafter, the "Expert Report").

121.   As previously described, Dr. Berger has been seeing Plaintiff weekly since 2017.

122.   Dr. Berger describes the impetus for Complainant seeking her treatment as follows:

> Client reported making attempts to notify administration of misconduct engaged in by students, however explained that he had received minimal support from administration with regards to disciplinary reports he had filed. **Client expressed feeling that the school had a 'vendetta' out for him since he had previously reported sexual misconduct by a staff member. Client reported that this lack of felt support exacerbated his symptoms**.

> [(Emphasis added).]

123.   Dr. Berger's report establishes that Plaintiff was always sensitive to the work environment created by DSD, and that he was and continues to be deeply impacted by it.

124.   Dr. Berger's report further provides that Plaintiff's symptoms manifested as follows:

> **In February 2020, this client attended his scheduled therapy session and reported being suspended from his teaching duties indefinitely due to student allegations.** The client reported anxiety evidenced in uncontrollable worry, racing thoughts, increased heart rate, difficulty sleeping and feeling out of control. Client also reported symptoms of depression evidenced in lack of motivation, fatigue, feelings of hopelessness, and decreased interest in previously enjoyed activities. **Client reported ruminating on thoughts regarding his professional future, the social implications for him and for his daughter, the reputation of his name as an individual and a teacher, and his future as a employee at Dover High School. Client reported significant distress when thinking about these possible realities.**

> [(Emphasis added).]

125.   Defendants were well aware of the fact that Plaintiff was regularly seeking

treatment from his therapist, and nonetheless opted to create a work environment that would operate to exacerbate his prognosis of PTSD.

126.     In her December 3, 2020 Expert Report, Dr. Berger further explains that:

> Throughout the investigation the client continued individual therapy to address symptoms and monitor coping through distress. **Client stated that he felt that he was being targeted after the state investigation found him not guilty, and the school announced they would be doing their own investigation.  Client reported social humiliation as previous and current students he encountered inquired about 'rumor' that he was fired.  Client identified continued distress regarding the integrity of his name in the community.  Client reports since return to work, he has continued to feel distress due to plan he is required to follow.**"

[(Emphasis added).]

127.     To the point, participants in Ms. Ruiz's Signal application chatroom noted their belief that Plaintiff had already been fired by DSD.

128.     Based on the forgoing, it is clear that DSD thoroughly understands Plaintiff's history of coping with and obtaining treatment for his PTSD diagnosis.

129.     Even so, DSD opted to unlawfully engage Plaintiff with preconditions for return to work, as well as ongoing ad hoc requirements via a CAP, the amalgamation of which constitutes knowing violations of Plaintiff's workplace rights.

130.     Indeed, since Plaintiff filed his claim with the EEOC, Defendants have continued to target him with frequent unannounced drop-ins during his classroom instruction, sending of text messages to his private phone after business hours, refusing to respond to his written inquiries, and the like.

## COUNT ONE
### (Title VII – Hostile Work Environment)

131.     Plaintiff incorporates by reference paragraphs 1 through 130 as though fully

set forth at length herein.

132.    Defendants subjected Plaintiff to a hostile working environment and discrimination based on his sex, as detailed above.

133.    For example, Defendants denied Plaintiff the same or similar due process rights to those afforded to his similarly situation women colleagues.

134.    The hostile work environment was severe and pervasive based on the nature of the harassment, including egregious disparate treatment and failure to offer due process by numerous DSD employees expressing animus towards Plaintiff, the constant and unwavering harassment and derogatory comments towards Plaintiff based on his sex, and Defendants' blatant denial of Plaintiff's workplace rights because of his sex.

135.    Plaintiff considered the aforementioned conduct to be discriminatory, and reported said discriminatory conduct, both verbally and in writing, to numerous management level employees of Defendant, including, but not limited to, Dr. McLaughlin, Ms. Cirigliano, and Mr. Franks.

136.    Accordingly, Defendants were fully aware of the hostile work environment. However, despite Plaintiff's numerous complaints of discrimination, Defendants failed to conduct an investigation or otherwise cause the discriminatory conduct to cease.

137.    Rather than cause the discriminatory conduct to cease, Defendants retaliated against Plaintiff by targeting him by placing him on an unjustifiable CAP.  However, Defendants' reason for Plaintiff's CAP is pretextual, and he was actually being targeted through the CAP in an effort to push Plaintiff out of the DSD for attempting to advance his workplace rights.

138.    Accordingly, Defendants' discriminatory acts have deprived Plaintiff of equal

employment opportunities because of his sex in violation of Title VII.

139.    As a direct result of the aforesaid unlawful discriminatory employment

practices engaged in by the Defendants in violation of Title VII, Plaintiff sustained

permanent and irreparable harm, which caused him to sustain a loss of earnings, plus the

value of certain benefits, plus loss of future earning power, plus back pay, and front pay and

interest due thereon.

140.    As a further direct result of the aforesaid unlawful discriminatory employment

practices engaged in by the Defendants in violation of Title VII, Plaintiff suffered severe

emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT TWO
### (Title VII – Retaliation)

141.    Plaintiff incorporates by reference paragraphs 1 through 140 as though fully

set forth at length herein.

142.    The actions of Defendants, through their agents, servants, and employees, in

subjecting Plaintiff to retaliation for opposing unlawful discrimination in the workplace,

constituted a violation of Title VII.

143.    For example, Defendants denied Plaintiff the same or similar due process

rights to those afforded to his similarly situation women colleagues.

144.    Defendants also subjected Plaintiff to and unlawful CAP and suspended

Plaintiff's employment in retaliation for registering numerous complaints of discrimination

in the workplace.

145.    The reason articulated for Plaintiff's CAP and suspension is pretextual, and

Defendants' adverse employment actions were actually in retaliation for Plaintiff opposing

unlawful discrimination in the workplace.

146.    As a direct result of the aforesaid unlawful retaliatory practices engaged in by the Defendants in violation of Title VII, Plaintiff sustained permanent and irreparable harm, resulting in the loss of his employment, which caused his to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

147.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of Title VII, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT THREE
### (NJLAD – Race Discrimination, Hostile Work Environment)

148.    Plaintiff incorporates by reference paragraphs 1 through 147 as though fully set forth at length herein.

149.    Defendants subjected Plaintiff to a hostile working environment and discrimination based on his sex, as detailed above.

150.    For example, Defendants denied Plaintiff the same or similar due process rights to those afforded to his similarly situation women colleagues.

151.    The hostile work environment was severe and pervasive based on the nature of the harassment, including egregious statements made by numerous employees expressing animus towards Plaintiff, the constant and unwavering harassment and derogatory comments towards Plaintiff based on his sex, and Defendant's blatant denial of Plaintiff's workplace rights because of his race.

152.    Plaintiff considered the aforementioned conduct to be discriminatory, and

reported said discriminatory conduct, both verbally and in writing, to numerous management level employees of Defendants, including, but not limited to, Dr. McLaughlin, Ms. Cirigliano, and Mr. Franks.

153.    Accordingly, Defendants were fully aware of the hostile work environment. However, despite Plaintiff's numerous complaints of discrimination, Defendants failed to conduct an investigation or otherwise cause the discriminatory conduct to cease.

154.    Rather than cause the discriminatory conduct to cease, Defendants retaliated against Plaintiff by targeting him by subjecting him to an unlawful CAP and unjustified suspension.  However, Defendants' reason for Plaintiff's CAP and suspension is pretextual, and he was actually being targeted in an effort to push Plaintiff out of the DSD for attempting to advance his workplace rights.

155.    Accordingly, Defendants' discriminatory acts have deprived Plaintiff of equal employment opportunities because of his sex in violation of the NJLAD.

156.    As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendants in violation of the NJLAD, Plaintiff sustained permanent and irreparable harm, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

**157.**    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendants in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

<u>**COUNT FOUR**</u>
**(NJLAD – Retaliation)**

158.    Plaintiff incorporates by reference paragraphs 1 through 157 as though fully

set forth at length herein.

159.   The actions of Defendants, through their agents, servants, and employees, in subjecting Plaintiff to retaliation for opposing unlawful discrimination in the workplace, constituted a violation of the NJLAD.

160.   For example, Defendants denied Plaintiff the same or similar due process rights to those afforded to his similarly situation women colleagues.

161.   Defendants also subjected Plaintiff to an unlawful CAP and suspended Plaintiff's employment in retaliation for registering numerous complaints of discrimination in the workplace.

162.   The reason articulated for Plaintiff's CAP suspension is pretextual, and Defendants' adverse employment actions were actually in retaliation for Plaintiff opposing unlawful discrimination in the workplace.

163.   As a direct result of the aforesaid unlawful retaliatory practices engaged in by the Defendants in violation of the NJLAD, Plaintiff sustained permanent and irreparable harm, resulting in the loss of his employment, which caused his to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

164.   As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

### COUNT FIVE
#### (ADA – Disability Discrimination)

165.   Plaintiff incorporates by reference paragraphs 1 through 164 as though fully

set forth at length herein.

166.   The actions of Defendants, through their agents, servants and employees, in discriminating against Plaintiff on the basis of his actual and/or perceived disabilities and/or record of impairment constituted violations of the ADA.

167.   As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendants in violation of the ADA, Plaintiff sustained permanent and irreparable harm, resulting in his suspension from employment, which caused his to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

168.   As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendants in violation of the ADA, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT SIX
### (ADA – Retaliation)

169.   Plaintiff incorporates by reference paragraphs 1 through 168 as though fully set forth at length herein.

170.   The actions of the Defendants, through their agents, servants and employees, in retaliating against Plaintiff for opposing unlawful disability discrimination in the workplace, constituted a violation of the ADA.

171.   As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of the ADA, Plaintiff sustained permanent and irreparable harm resulting from the suspension and/or of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning

power, plus back pay, front pay, and interest due thereon.

172.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of the ADA, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT SEVEN
### (NJLAD – Disability Discrimination)

173.    Plaintiff incorporates by reference paragraphs 1 through 172 as though fully set forth at length herein.

174.    The actions of the Defendants, through their agents, servants and employees, in retaliating against Plaintiff for opposing unlawful disability discrimination in the workplace, constituted a violation of the NJLAD.

175.    As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of the NJLAD, Plaintiff sustained permanent and irreparable harm resulting from the suspension and/or of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, front pay, and interest due thereon.

176.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT EIGHT
### (NJLAD – Retaliation)

177.    Plaintiff incorporates by reference paragraphs 1 through 176 as though fully

set forth at length herein.

178.    The actions of the Defendants, through its agents, servants and employees, in retaliating against Plaintiff for opposing unlawful disability discrimination in the workplace, constituted a violation of the NJLAD.

179.    As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of the NJLAD, Plaintiff sustained permanent and irreparable harm resulting from the suspension and/or loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, front pay, and interest due thereon.

180.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT NINE
### (NJLAD – Aider & Abettor Liability)

181.    Plaintiff incorporates by reference paragraphs 1 through 180 as though fully set forth at length herein.

182.    The NJLAD § 10:5-12(e) sets forth in pertinent part as follows: "Unlawful employment practices, discrimination. It shall be an unlawful employment practice, or, as the case may be, unlawful discrimination: e) For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or attempt to do so."

183.    Dr. McLaughlin, Ms. Cirigliano, and Mr. Franks engaged in an unlawful discriminatory practice in violation of NJLAD § 10:5-12(e) by aiding, abetting, inciting,

compelling, and coercing the discriminatory conduct against the Plaintiff as set forth herein.

184.    Ms. Grisales and Ms. Ruiz engaged in an unlawful discriminatory practice in violation of NJLAD § 10:5-12(e) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct against the Plaintiff as set forth herein.

185.    As a further direct result of the aforesaid unlawful employment practices engaged in by the Defendants in violation of the NJLAD, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT TEN
### (Tortious Interference With Contractual Relations)

186.    Plaintiff incorporates by reference paragraphs 1 through 185 as though fully set forth at length herein.

187.    For over a decade, Plaintiff served as the Accountant for DHS and put in his paperwork to continue in his position for the 2020 academic year, evidencing a prospective economic or contractual relationship and demonstrating that he retained a reasonable expectation of economic advantage.

188.    Defendants' actions in informing Dr. McLaughlin's decision to deny Plaintiff is role as DHS's Accountant was an interference done intentionally, without justification or excuse, and with malice.

189.    Defendants' interference caused the loss of Plaintiff's prospective gain from his typical role as DHS's Accountant.

190.    But for Defendants' interference, there was a reasonable probability that Plaintiff would have received the anticipated economic benefits by having his Accountant role with the DHS renewed as had been done for over a decade prior.

191.    Defendants' actions interfering with Plaintiff's prospective contract caused Plaintiff injury and economic damage.

## COUNT ELEVEN
### (Defamation)

192.    Plaintiff incorporates by reference paragraphs 1 through 191 as though fully set forth at length herein.

193.    Upon information and belief, Defendants have publicly and privately spread false and damaging information and published said information accusing Plaintiff of inappropriate sexual interactions with minors in official BOE meetings, via email, and in social media groups that place Plaintiff in a false light, constituting unlawful defamatory statements.

194.    Upon information and belief, Defendants have further published false and damaging information accusing Plaintiff inappropriate sexual interactions with minors on social media (e.g., Signal) in retaliation for Plaintiff's objecting to the BOE's abrupt suspension that was violative of his workplace rights.

195.    To date, Defendants knowingly and recklessly continued to spread false information about Plaintiff, notwithstanding being put on notice of the falsity of the information.

196.    The information spread by Defendants has been seen by third-parties that have broached the topic with Plaintiff in his daily life outside of his work for DSD.

197.    Neighbors in Plaintiff's town have approached him about the accusations against him concerning his alleged inappropriate engagement with minors.

198.    Third-parties, including Plaintiff's former students and work colleagues, have

approached him stating they heard his employment was terminated because he had engaged inappropriately with his students in a sexual manner.

199.    Plaintiff has suffered damage to his reputation and has lost of job opportunities as a result of Defendants' knowing and reckless spreading of misinformation about Plaintiff.

200.    Plaintiff was embarrassed and offended by Defendants' spread of misinformation regarding his interactions with his students on social media.

201.    Defendants are well aware of the sensitivity of the information they spread and the damage to Plaintiff, and nonetheless have refused to refrain from spreading misinformation about Plaintiff's interactions with his students.

202.    Plaintiff and his family have also suffered damage to their reputations in the community in which they reside due to the false information published to Defendants' social media.

203.    Defendants published false information about Plaintiff to their social media with a purpose contrary to the interests of any qualified privilege.

204.    Because of Defendants' unlawful actions, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT TWELVE
### (Civil Conspiracy to Commit Tortious Interference with Contract)

205.    Plaintiff incorporates by reference paragraphs 1 through 204 as though fully set forth at length herein.

206.    Defendants acted in concert to commit the unlawful act of attempting to interfere with Plaintiff's ability to have his contract renewed with the DSD.

207.     Defendants employed unlawful means in their attempt to interfere with Plaintiff's contract with DSD insofar as Ms. Ruiz endeavored to enlist minors and other third-parties to engage in a letter-writing and public comment campaign before the BOE to undermine Plaintiff's 2020 contract renewal.

208.     Defendants agreed to work together with Dr. McLaughlin to find a justification for their desire to interfere with Plaintiff's contract renewal with DSD, resulting in the infliction injury upon Plaintiff.

209.     Defendants' overt accusations of Plaintiff as having inappropriately engaged with his minor students resulted in damage to Plaintiff reputationally and economically.

210.     Because of Defendants' unlawful actions, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## PRAYER FOR RELIF

211.     Plaintiff incorporates by reference Paragraphs 1 through 210 of his Complaint as though fully set forth at length herein.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in his favor and against the Defendant, and order that:

a.     Defendants compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination.

b.     Defendants compensate Plaintiff with an award of front pay, if appropriate;

c.     Defendants pay to Plaintiff punitive damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses as allowable;

d.    Defendants pay to Plaintiff, pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

e.    The Court award such other relief as is deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: October 7, 2021

**DAWKINS & WARRINGTON LAW GROUP**

 /s/ Clifford D. Dawkins, Jr.
Clifford D. Dawkins, Esq. (ID. NO.: 164792015)
239 New Road, Suite B205
Parsippany, NJ 07054
T: (201) 919-5458
Cliff@DawkinsWarrington.com
*Attorneys for Plaintiff*

## **VERIF'ICATION**

I, STEVEN C. LAUTO, of appropriate age and sound mind hereby verify that the statements contained in this Complaint are true and correct to the best of my knowledge, information, and belief.  I understand that false statements herein are made subject to the penalties relating to unsworn falsification to authorities.


Date _____                          _____

                                                                  STEVEN CHRISTOPHER LAUTO, *Plaintiff*